UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WAYNE GIRAUD,<br><br>                      Plaintiff,<br><br>     -against-<br><br>MTA METRO-NORTH RAILROAD COMPANY,<br><br>                      Defendant. | **MEMORANDUM OPINION<br>AND ORDER**<br><br>09 Civ. 2187 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Wayne Giraud filed this action on March 10, 2009, alleging that Defendant wrongfully terminated his employment in violation of the Railway Labor Act ("RLA") and seeking reinstatement and money damages under 45 U.S.C. § 153 (q). (Cmplt. ¶ 1) The Complaint seeks to vacate the award of Special Adjustment Board No. 959, which upheld Plaintiff's termination. On August 6, 2009, Defendant filed a motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim under Fed. R. Civ. P. 12(b)(1) and (b)(6). (Docket No. 8) For the reasons set forth below, Defendant's motion to dismiss will be GRANTED.

## BACKGROUND

        Plaintiff joined Metro-North in 1994 as an electrician, became a conductor in 1996, and was promoted to passenger engineer in 1998. (Cmplt. ¶ 3) On August 13, 2004, a Metro-North train operated by Plaintiff overran the platform at Grand Central and hit the bumping block for Track 109. Three passengers were injured and the train and tracks sustained $55,000 in damage. (Id. ¶ 5; Singh Aff. Ex. J at 2, 5-6) After the

incident, Plaintiff was taken to Bellevue Hospital Center, where tests were administered that revealed nothing unusual. (Cmplt. ¶ 9)

The collective bargaining agreement between Defendant and the Association of Commuter Rail Employees ("ACRE") – which represents Plaintiff – provides for a three-step disciplinary procedure. (Singh Aff. ¶¶ 1-3, Ex. A) The process begins with investigation and disciplinary proceedings within Defendant's Operations Services Department; the decision made by that body may be appealed through arbitration before a special adjustment board. (Id. Ex. J at 5) Each adjustment board has three members – a union member, a carrier member, and a Chairman, who is a neutral party. (Id. at 12)

On August 19, 2004, Defendant notified Plaintiff of a disciplinary investigation involving a charge that he had improperly failed to control the speed of the train involved in the August 13 collision. (Singh Aff. ¶ 6, Exs. B-C) Plaintiff was directed to attend an investigative hearing, which was conducted on September 9, 2004. (Id.) On September 15, 2004, Plaintiff was notified that he had violated a number of Operating Department Rules and that his employment was terminated effective immediately. (Cmplt. ¶ 4; Singh Aff., Ex. E)

Plaintiff, represented by ACRE, appealed his dismissal through arbitration before the Special Board of Adjustment No. 959 ("the Board"). (Cmplt. ¶ 7) The Board held a hearing on January 28, 2008. At that hearing, ACRE argued that Plaintiff had suffered a loss of consciousness immediately before the accident. Plaintiff contended that he had experienced an episode of syncope, a medical condition that occurs "when blood vessels in the legs dilate, causing a large proportion of a person's blood volume to

pool in the legs.  As a result the blood pressure drops [and] the brain suddenly is not receiving an adequate amount of oxygen."  (Cmplt. ¶ 9 (citing ACRE's brief to the Board); see also Singh Aff., Ex. J)  The Board considered the entire investigative hearing transcript and medical records offered by Plaintiff.  (Singh Aff., Ex. J at 10-11)  The Board refused to adjourn the proceedings, however, to await the outcome of ongoing neurological testing for syncope, which eventually led to a diagnosis of syncope.  (Id. Ex. J; Giraud Aff. ¶ 17)

On March 30, 2008, the Board issued a decision upholding Plaintiff's dismissal, finding that "the medical documentation submitted by Claimant failed to establish a medical condition which would have predisposed Claimant to black out and lose control of his train."  (Singh Aff. Ex. J at 10; Cmplt. ¶ 11)  The Board also found that Giraud had not offered credible testimony supporting his syncope theory.  (Id.)

## DISCUSSION

I. **LEGAL STANDARD**

"To survive a motion to dismiss," a claim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In making this determination, a Court must be mindful of two corollary rules.  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  Id.  In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. (citing Twombly, 550 U.S. at 555).  "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss."  Id. at

1950 (citing Twombly, 550 U.S. at 556). The Supreme Court has stated that "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. (citation omitted).

"When determining the sufficiency of plaintiffs' claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in plaintiffs' . . . complaint, . . . to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993). The following documents are properly before the Court because they were incorporated by reference in the Complaint or otherwise relied on by Plaintiff in bringing his suit: (1) the collective bargaining agreement between Plaintiff's union and Defendant (Singh Aff., Ex. A); (2) the August 19 and 24, 2004 letters from Defendant notifying Plaintiff of the disciplinary investigation (id. Ex. B & C); (3) the transcript of Plaintiff's investigative hearing (id. Ex. D); (4) the Operations Service Department Notice of Discipline terminating Plaintiff's employment (id. Ex. E); (5) ACRE's submission to the Special Board of Adjustment No. 959 (id. Ex. H); and (6) the Adjustment Board's decision upholding Plaintiff's termination (id. Ex. J).

## II.     STATUTORY BACKGROUND

"The Railroad Labor Act was passed in 1926 to encourage collective bargaining by railroads and their employees in order to prevent . . . wasteful strikes and interruptions of interstate commerce." Detroit & T.S.L.R. Co. v. United Transp. Union, 396 U.S. 142, 148 (1969). The RLA created local boards to settle disputes associated

with major company agreements and policies and with workers' employment.  See Ollman v. Special Bd. of Adjustment No. 1063, 527 F.3d 239, 245 (2d Cir. 2008).  In 1934, the RLA was amended to create the National Railroad Adjustment Board ("NRAB"), which was given responsibility for resolving grievances "between employees, unions, and carriers."  Id.; see 45 U.S.C. § 153 First (a) ("disputes may be referred by petition of the parties or by either party to the appropriate division of the [NRAB] with a full statement of the facts and all supporting data bearing upon the disputes.").

In 1966, Congress again amended the RLA, authorizing the formation of "special adjustment boards."  Id. § 153 Second.  Each board consists of a three-person panel, with one member chosen by the carrier, one by the representative of the employees, and one neutral panelist.  Id.  A special adjustment board may resolve disputes otherwise referable to the NRAB on consent of the carrier and employee representative.  Id.

An adjustment board's decision is binding and enforceable in the District Courts, id. § 153 First (p), and "[g]enerally, federal courts lack jurisdiction to review the findings of an Adjustment Board."  DeClara v. Metropolitan Transp. Authority, 748 F. Supp. 92, 94-95 (S.D.N.Y. 1990) (citing Andrews v. Louisville & Nashville Railroad Co., 406 U.S. 320, 324 (1972) (differing interpretations of collective bargaining agreements must be resolved through arbitration and not in federal courts); Baylis v. Marriott Corp., 843 F.2d 658, 662 (2d Cir. 1988) (arbitration proceedings provide the exclusive forum for interpretation of contracts under the RLA; federal courts therefore lack jurisdiction to hear such claims).  "Judicial review of Adjustment Board orders is limited to three specific grounds:  (1) failure of the Adjustment Board to comply with the

requirements of the Railway Labor Act; (2) failure of the Adjustment Board to conform, or confine, itself to matters within the scope of its jurisdiction; and (3) fraud or corruption." Union Pacific Railroad v. Sheehan, 439 U.S. 89, 93 (1978); see 45 U.S.C. § 153 First (q).  The Supreme Court has "time and again emphasized that this statutory language means just what it says." Sheehan, 439 U.S. at 93 (citing cases).

### III.    THE COMPLAINT FAILS TO ALLEGE SUBJECT MATTER JURISDICTION

Plaintiff argues that the Board "acted outside of their jurisdiction by not giving consideration to Mr. Giraud's medical condition of suffering from syncope." (Opp. at 5)  Plaintiff's argument is meritless.  It is clear from a review of the Board's decision that it explicitly considered both the medical evidence and Plaintiff's argument that he had experienced a syncope episode.  Even if the Board had not considered this evidence and this argument, however, Giraud has not demonstrated that it would be appropriate for this Court to make an "exceeds jurisdiction" finding under Section 153(q).

The Board's decision sets forth all of ACRE's arguments, including its claim that "the Carrier did not have just cause to dismiss Claimant because Claimant experienced a momentary loss of consciousness, in all probability, due to the pooling of blood in his legs during a long period of confinement in his operating ban, an event known as a syncope episode." (Singh Aff., Ex. J at 9)  In the "Discussion" section of its decision, the Board assesses the medical evidence, including the "medical documentation submitted by Claimant."  With respect to "a medical report regarding [Giraud's] treatment post incident, authored by [his physician] Michael Logue, M.D.," the Board notes that Dr. Logue concluded that his tests did "not uncover[] an arrhythmic disorder."

6

Dr. Logue's tests "revealed a hypertension condition[, however,] which is the antithesis of the underlying cause that puts one into a syncope state as described in the medical literature." The Board also noted that reports from Bellevue Hospital Center stated that "all tests administered to Claimant since the incident were negative." (Id. at 9-11)

After addressing Plaintiff's medical evidence, the Board then analyzed Giraud's testimony concerning the accident, and considered whether it supported his syncope claim. The Board began by noting "a discrepancy in the testimony of Claimant." (Id.) At the investigative hearing, Giraud testified that when he regained consciousness he was still seated but not slumped over. (Id.) At the Board hearing, however, Giraud testified that he blacked out while he was in a standing position, "thus contradicting himself and negating his own credibility." (Id. at 11) Giraud had "improved" his story as to an important point, because the medical evidence "indicates that it is rare for a person to faint from a seated position." (Id.) The Board also noted that the medical literature "indicates that a person sustaining a syncope episode has prior if only momentary symptoms such as lightheadedness, dizziness and/or sweaty palms. Claimant claimed no such condition existed." (Id.)

Accordingly, it is clear that the Board considered the medical evidence introduced at the hearing and determined that "the medical documentation submitted by Claimant failed to establish a medical condition which would have predisposed Claimant to black out and lose control of his train." Id. at 10  While Plaintiff may disagree with how the Board weighed the medical evidence, that is not a proper ground for judicial review under Section 153(q).

In order for a court to find an "exceeds-jurisdiction" basis for judicial review under Section 153(q), a Board award must be "wholly baseless and completely without reason." Gunther v. San Diego & Arizona E. Ry., 382 U.S. 257, 261 (1965). Furthermore, "[w]here fraud is not at issue, the court's inquiry is limited to the sole issue of 'whether the arbitrators did the job they were told to do – not whether they did it well, or correctly, or reasonably, but simply whether they did it." Segal v. Trans World Airlines, Inc., 63 F. Supp. 2d 373, 380 (S.D.N.Y. 1999) (quoting CSX Transp., Inc. v. United Transp. Union, 950 F. 2d 872, 877 (2d Cir. 1991). See also Major League Baseball Players Ass'n v. Garney, 532 U.S. 504, 509 (2001) ("Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement. . . . If an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision.").

Here, Plaintiff argues that the Board should have done more to determine whether he had experienced a syncopal episode:

> In Mr. Giraud's case, there was no examination ordered by the Adjustment Board, not even to determine whether Mr. Giraud had blacked out, much less whether he suffered from an episode of syncope. The Board did not solicit testimony from a medical professional so that an informed decision by the Board could be made. From a reading of the decision of the Adjustment Board it is not clear whether they were even familiar with the condition and its causes. . . . The Board showed no compulsion, no tendency, no hint, not even a curiosity to find out whether or not Mr. Giraud suffered from syncope nor to even find out or determine what syncope is. In essence, the Board declared themselves medical experts and concluded that Mr. Giraud suffered no medical condition.

(Opp. at 6-7)

As an initial matter, the Complaint does not plead, and Plaintiff does not argue, that he ever requested that the Board order an examination or "solicit testimony from a medical professional." Plaintiff instead chose to rely on the medical reports he submitted to the Board. It is apparent, as discussed above, that the Board considered this evidence, as well as Plaintiff's testimony – including aspects of his testimony that were inconsistent – and concluded that Plaintiff had not demonstrated that he had experienced a syncopal episode. The Board is required to do no more. See Sheehan, 439 U.S. at 93 (reversing Court of Appeals decision reversing a district court ruling upholding a Board decision; "If the Court of Appeals' remand was based on its view that the Adjustment Board had failed to consider respondent's equitable tolling argument, the court was simply mistaken. The record shows that respondent tendered the tolling claim to the Adjustment Board, which considered it and explicitly rejected it. If, on the other hand, the Court of Appeals intended to reverse the Adjustment Board's rejection of respondent's equitable tolling argument, the court exceeded the scope of its jurisdiction to review decisions of the Adjustment Board.")

Giraud's reliance on Gunther v. San Diego & Arizona Eastern Railway Co., 382 U.S. 257 (1965), is entirely misplaced. In Gunther, the plaintiff was an engineer who lost his job after the Company's doctors determined that he suffered from a heart condition. Id. at 258-59. Plaintiff's medical experts found no disability, however, and after a committee of physicians appointed by the Board agreed, the Board issued a decision holding that Gunther should be reinstated. Id. at 259. Gunther sued after the Company refused to comply with the Board's decision. The district court vacated the Board's award, and the circuit court affirmed, holding that the Company was entitled to

9

rely on its physicians' "good faith findings of disability" and that the Board had exceeded its powers in appointing and in relying on the physician panel. Id. at 261-62.

In reversing, the Supreme Court held that the Board had not exceeded its jurisdiction in appointing the physician panel, and emphasized the deference owed to Board determinations:

> Certainly it cannot be said that the Board's interpretation was wholly baseless and completely without reason. We hold that the District Court and the Court of Appeals as well went beyond their province in rejecting the Adjustment Board's interpretation of this railroad collective bargaining agreement. As hereafter pointed out Congress, in the Railway Labor Act, invested the Adjustment Board with the broad power to arbitrate grievances and plainly intended that interpretation of these controversial provisions should be submitted for the decision of railroad men, both workers and management, serving on the Adjustment Board with their long experience and accepted expertise in this field.
>
> *   *   *   *
>
> The courts below were also of the opinion that the Board went beyond its jurisdiction in appointing a medical board of three physicians to decide for it the question of fact relating to petitioner's physical qualifications to act as an engineer. We do not agree. . . .We reject the idea that the Adjustment Board in some way breached its duty or went beyond its power in relying as it did upon the finding of this board of doctors.

Id. at 261-63.

While the Gunther court endorsed the Board's appointment of a physician panel in that case, nothing in that decision – or in any other case – suggests that the Board here was required – as Plaintiff argues – to appoint a panel of physicians to consider Plaintiff's syncope argument. (See Opp. at 5-6)

10

Finally, even if Giraud were able to demonstrate that the Board exceeded its jurisdiction, he seeks relief that is not available under Section 153(q).  The Complaint demands a jury trial, injunctive relief, reinstatement with seniority and back pay, and compensatory and emotional distress damages.  (Cmplt. Prayer for Relief ¶¶ b-f)  This relief is not available in an action seeking review under Section 153(q).  See, e.g., Finley Lines v. Norfolk Southern Railway Co., 312 F.3d at 946 n.1 ("Even in the very rare instances when an arbitrator's procedural aberrations rise to the level of affirmative misconduct, as a rule the court must not foreclose further proceedings by settling the merits according to its own judgment of the appropriate result, since this step would improperly substitute a judicial determination for the arbitrator's decision that the parties bargained for in the collective-bargaining agreement.  Instead, the court should simply vacate the award. . . . [It may] remand for further proceedings when this step seems appropriate.") (citing United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 40 n.10 (1987)).

## IV.     PLAINTIFF'S DUE PROCESS AND PUBLIC POLICY ARGUMENTS HAVE NO MERIT

Without citing any supporting authority, and in a conclusory fashion, Giraud argues that the Board "violated the due process rights of Mr. Giraud and went against public policy" when it allegedly terminated Giraud's employment without conducting "a fair and complete inquiry" as to Giraud's medical condition.  (Opp. at 7)

With respect to Giraud's due process argument, "where an employee has the right under a contract to seek arbitration of the dispute, his constitutional rights are protected by those procedures."  DeClara v. Metropolitan Transp. Authority, 748 F. Supp. 92, 96 (S.D.N.Y. 1990); see also Parrett v. City of Connersville, 737 F.2d 690, 696 (7th

Cir. 1984) ("dispute resolution created by a collective bargaining agreement can satisfy due process requirements"); Jackson v. Temple Univ., 721 F.2d 931, 933 (3d Cir. 1983) ("the right to proceed to arbitration provided [the employee] with an adequate due process safeguard").

As DeClara makes clear, Plaintiff cannot make out a due process claim by contending that the Board's determination was wrong or that it should have conducted a more thorough analysis of his medical condition:

> DeClara does not deny the existence of the arbitration proceeding and he has already participated in an arbitrated hearing on his termination. Indeed, DeClara questions the Board's interpretation of the contract; he does not challenge the post-deprivation hearings as constitutionally insufficient. In light of established law in this field, the arbitration proceedings safeguarded DeClara's due process rights. The Board's unfavorable decision to DeClara does not turn the process into a constitutional violation. Absent a due process claim, DeClara has not . . . put forth a potential fourth exception to § 153 First (q).

DeClara v. Metropolitan Transp. Authority, 748 F. Supp. at 96. There is no basis for concluding that the Board denied Plaintiff due process in finding that he had not offered evidence indicating that he had experienced a syncopal episode.

With respect to Plaintiff's public policy claim, "[a]s with any contract . . . a court may not enforce a collective-bargaining agreement that is contrary to public policy." W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, 461 U.S. 757, 766 (1983) (citing Hurd v. Hodge, 334 U.S. 24, 34-35 (1948)). For a public policy to exist and void an agreement, however, it "must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" Id. (citing Muschany v. United States, 324

U.S. 49, 66 (1945)). There is no indication here that Plaintiff is challenging the collective bargaining agreement itself, or any other agreement entered into by ACRE and Defendant. Nor does Giraud explain how it would be against public policy for the Board to uphold a dismissal where the Company had offered evidence that the accident here was caused by Plaintiff's misconduct and was not due – as Plaintiff argued – to a medical condition. Similarly, given that the Board concluded that the accident was caused by Plaintiff's misconduct and not by a medical condition, Plaintiff does not explain why the Board was required to consider whether Plaintiff should not be terminated but instead appointed a conductor or electrician. (Opp. at 8)

## CONCLUSION

For the reasons stated above, Defendant's motion to dismiss (Docket No. 8) is GRANTED. The Clerk of the Court is directed to terminate this motion and to close this case. Any other pending motions are moot.

Dated: New York, New York  
      March 12, 2010

SO ORDERED.

_____  
Paul G. Gardephe  
United States District Judge